UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NICHOLAS STRINGER | CIVIL ACTION |
| VERSUS | NO. 25-165 |
| SPECIALTY OFFSHORE, INC., *et al.* | SECTION M (5) |

## ORDER & REASONS

Before the Court is a motion by plaintiff Nicholas Stringer to reconsider this Court's August 27, 2025 Order & Reasons denying his motion for summary judgment on seaman status.[1] Defendant Specialty Offshore, Inc. ("Specialty") responds in opposition,[2] and Stringer replies in further support of his motion.[3] Also before the Court is Specialty's motion for summary judgment on seaman status,[4] to which Stringer responds in opposition,[5] and Specialty replies in further support of its motion.[6] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying Stringer's motion, granting Specialty's, and dismissing with prejudice those of Stringer's claims that depend on seaman status.

## I.    BACKGROUND

This case involves a maritime injury.  On June 27, 2023, Stringer began working for Specialty as a dive tender.[7]  During his tenure with Specialty, Stringer also worked as an apprentice diver and a laborer or general construction worker.[8]  In December 2024, Stringer worked for

---

[1] R. Doc. 32 (citing R. Docs. 16 (Stringer's motion for summary judgment); 27 (Order & Reasons denying Stringer's motion for summary judgment)).
[2] R. Doc. 42.
[3] R. Doc. 48.
[4] R. Doc. 41.
[5] R. Doc. 43.
[6] R. Doc. 45.
[7] R. Docs. 16-3 at 1; 26-5 at 1.
[8] R. Doc. 26-5 at 1.

Specialty as a commercial diver on a project for the Alcoa Chemical Plant (the "Alcoa project") in Newburgh, Indiana, on the Ohio River.[9]  Specialty rented a small work barge from Compass Marine to use as a platform to hold various equipment, including dive support equipment, for the project.[10]  On December 5, 2024, Stringer, and other Specialty workers, met at Compass Marine's facility in Owensboro, Kentucky.[11]  Specialty's workers loaded the equipment onto the barge, which they then rode as it was pushed upriver by a Compass Marine pushboat.[12]  Dennis McGrady, Stringer's diver supervisor, operated the pushboat.[13]  Stringer rode in the crane on the work barge to act as a lookout.[14]  When the barge arrived in Newburgh, it was secured by wedging it between two pylons, about an inch away from each pylon, with the barge abutting directly against land.[15]  The work barge, which was secured in place with a "spud," remained stationary for the duration of Stringer's work on the Alcoa project, other than being pushed forward five feet once and slightly swaying when vessels passed.[16]  Once the barge was secured, Specialty's workers, including Stringer, disembarked, obtained lodgings on land, and were allotted a *per diem* allowance for their onshore lodgings and food.[17]  On subsequent work days, Stringer and his co-workers drove to the Alcoa project, parked near a bridge, walked to the pylons, and then descended a ladder to the barge.[18]  Stringer did not sleep or regularly travel on the barge during the Alcoa project.[19] However, Stringer did occasionally eat breakfast or lunch on the barge.[20]

---

[9] R. Docs. 16-3 at 1; 26-5 at 1; 41-1 at 7.
[10] R. Docs. 26-5 at 2; 41-1 at 8.
[11] R. Docs. 26-5 at 2; 41-1 at 8.
[12] R. Docs. 26-5 at 2; 41-1 at 8.
[13] R. Docs. 32-1 at 13-16 (citing R. Doc. 32-5); 41-1 at 8.
[14] R. Docs. 26-5 at 2; 32 at 16; 41-1 at 8.
[15] R. Docs. 26-5 at 2; 41-1 at 8-9.
[16] R. Docs. 26-5 at 2; 41-1 at 8-9.
[17] R. Docs. 26-5 at 2-3; 41-1 at 9.
[18] R. Docs. 26-5 at 3; 41-1 at 9.
[19] R. Docs. 26-5 at 3; 41-1 at 9.
[20] R. Doc. 32-1 at 16-18.

Stringer worked as a commercial diver on the Alcoa project for 14 days and made eight dives.[21]  He alleges that, while he was conducting a series of dives on December 19, 2024, he experienced central nervous system decompression illness (*i.e.*, the "bends"), because he was not provided with in-water decompression, and that Specialty then failed to provide him with prompt and necessary medical treatment, resulting in "severe and disabling injuries" that have rendered him "medically unfit to continue his career as a commercial diver."[22]  Stringer brings claims against Specialty for negligence under the Jones Act and general maritime law, along with general maritime law claims for unseaworthiness and maintenance and cure.[23]

Stringer previously moved for partial summary judgment on seaman status, arguing that, as a matter of law, commercial divers, like him, are Jones Act seamen.[24]  Stringer first contended that the Fifth Circuit in *Wallace v. Oceaneering International*, 727 F.2d 427 (5th Cir. 1984), and the Louisiana supreme court in *Wisner v. Professional Divers of New Orleans*, 731 So. 2d 200 (La. 1999), established a "diver's exception" whereby divers are automatically considered Jones Act seamen without the need to satisfy the traditional test for seaman status.[25]  Alternatively, Stringer argued that the facts of his employment with Specialty show that he passes the seaman-status test established by the Supreme Court in *Chandris, Inc. v. Latsis,* 515 U.S. 347 (1995), and refined by the Fifth Circuit in *Sanchez v. Smart Fabricators of Texas, L.L.C.*, 997 F.3d 564 (5th Cir. 2021).[26]  Stringer asserted that he contributed to the mission of the barge (performing the Alcoa project) and engaged in classic sea-going work (diving), which was substantial in nature and exposed him to the perils of the sea.[27]  He also contended that he owed his allegiance to both a shoreside employer

---

[21] R. Docs. 16-3 at 1; 41-1 at 10.
[22] R. Docs. 16-3 at 3-4; 1 at 3.
[23] R. Doc. 1 at 4-5.
[24] R. Doc. 16.
[25] R. Doc. 16-1 at 7-10.
[26] *Id.* at 10-17.
[27] *Id.* at 10-16.

(Specialty) and the barge.[28]  Further, Stringer said that he worked as a diver for Specialty for 85 days and that, during that time, he worked on vessels that were owned, leased, or controlled by Specialty for 80 days, or 94% of the time.[29]

In opposition, Specialty argued that there is no "diver's exception," because the Fifth Circuit and other courts have held that a diver must still satisfy the seaman-status requirements set out in *Chandris* and *Sanchez*.[30]  Specialty contended that *Wallace* and *Wisner* are factually distinguishable and have been limited in their application by subsequent decisions.[31]  Specialty further argued that Stringer does not satisfy the *Chandris/Sanchez* test for seaman status because he neither regularly lived, nor worked, on vessels.[32]  According to Specialty, between June 2023 and December 2024, Stringer worked sporadically for 87 days (a total of 924 hours), on nine different projects, four of which did not use a vessel at all and two of which used vessels owned and controlled by Specialty's clients.[33]  And, of those 924 hours, Stringer spent only 50.5 hours diving, equating to approximately 5.5% of his time working for Specialty.[34]  Further, said Specialty, Stringer worked on vessels owned or controlled by Specialty on just three projects for 273 hours, which is less than one-third of his time working at Specialty.[35]  In light of these facts, Specialty urged that more discovery was required to illuminate whether Stringer can satisfy the seaman-status test articulated in *Chandris* and *Sanchez*.[36]  Specialty also moved to sever the seaman-status issue from the rest of the case for expedited determination, including discovery on

---

[28] *Id.* at 13.
[29] *Id.* at 2, 13-14, 16-17.
[30] R. Doc. 26 at 5-13.
[31] *Id.*
[32] *Id.* at 5-17.
[33] *Id.* at 5 (citing R. Doc. 26-1).
[34] *Id.* (citing R. Doc. 26-1).
[35] *Id.* (citing R. Doc. 26-1).
[36] *Id.* at 13-16.

that issue alone, arguing that, if Stringer is not a seaman, he would be classified as a longshoreman and the causes of action alleged in his seaman's complaint would be dismissed.[37]

Because this Court agreed with Specialty that discovery was required, it granted Specialty's motion to sever and denied Stringer's motion for summary judgment.[38] As to Stringer's "diver's exception" argument, the Court held that neither *Wallace* nor *Wisner* creates a blanket "diver's exception" to the seaman-status test, meaning that a diver, like any other Jones Act plaintiff, must satisfy the mandates of *Chandris* and *Sanchez*.[39] The Court further noted that "[e]ven if there were merit to Stringer's position that *Wallace* and *Wisner* established some kind of 'diver's exception' that still exists today, he has not demonstrated that the exception applies to him," because he did not live and work on vessels in the open sea.[40] In holding that more discovery was required to determine whether Stringer is a seaman under the *Chandris/Sanchez* test, the Court noted that Stringer has at least two problems in satisfying the second prong: a connection to a vessel or identifiable fleet of vessels that is substantial in both duration and nature.[41]

## II.    PENDING MOTIONS

Stringer argues that summary judgment in his favor on the seaman-status issue is appropriate because discovery has revealed that he had a substantial connection to a fleet of vessels controlled by Specialty that was substantial in both duration and nature.[42] Stringer contends that Specialty's corporate representative, Deborah Wallace, testified at the company's deposition taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure that Stringer was assigned to vessels 97.6% of the time he worked for Specialty.[43] Stringer says that this sworn deposition

---

[37] R. Doc. 10.
[38] R. Doc. 27.
[39] *Id.* at 11-12.
[40] *Id.* at 12-13.
[41] *Id.* at 13.
[42] R. Doc. 32-1 at 20-23.
[43] *Id.* at 2-7 (citing R. Docs. 32-3; 32-4; 32-6).

testimony stands in stark contrast to the 5.5% figure that Specialty derived from the statements made in Wallace's declaration that Specialty attached to its opposition to Stringer's prior motion for summary judgment.[44]  Stringer also argues that the time he spent diving is irrelevant because McGrady testified that the dive crew was always on call to do the vessel's work.[45]  Thus, says Stringer, he has satisfied the duration prong.[46]  Stringer further argues that all of the vessels on which he worked for Specialty were controlled by Specialty, even if the company did not own or charter them, because McGrady testified that Specialty's dive supervisor can submit orders to a vessel's master to protect divers during dives.[47]  Stringer also says that Wallace admitted at Specialty's corporate deposition that Stringer was attached to a fleet of dive support vessels while he worked for the company.[48]  Stringer points to McGrady's testimony that McGrady operated the Compass Marine pushboat used to move the dive support vessel to the Alcoa job, that Stringer assisted in its navigation, and that Specialty's employees sometimes ate on the dive support vessel.[49]

In opposition to Stringer's motion and in support of its own motion, Specialty contends that the amount of time that Stringer was assigned to vessels (*Chandris*'s duration prong) is irrelevant because he cannot satisfy the three additional *Sanchez* factors.[50]  Specialty asserts that the undisputed evidence shows that Stringer "was a land based employee who worked on 9

---

[44] *Id.* (referencing R. Doc. 26-1).
[45] *Id.* at 5-7 (citing R. Doc. 32-5).
[46] *Id.* at 2-7.
[47] *Id.* at 7-12 (citing R. Doc. 32-5).
[48] *Id.* at 12-13 (citing R. Doc. 32-6).
[49] *Id.* at 14-18 (citing R. Doc. 32-5).
[50] R. Docs. 41-1 at 3, 10-21; 42 at 8-9, 11-12.  Specialty makes procedural arguments in its opposition to Stringer's motion to reconsider, which Stringer addresses in his reply.  R. Docs. 42 at 1-5; 48 at 1-6.  The Court need not specifically address these arguments because it is considering Stringer's motion as a renewed motion for summary judgment.  Specialty also clarifies Wallace's testimony regarding the time Stringer spent diving and on vessels.  R. Docs. 42 at 6-7; 45 at 4-5.  However, these clarifications are immaterial because the Court has determined that, regardless of Stringer's time spent aboard vessels, he cannot satisfy the *Sanchez* factors.

different jobs for 8 different clients in six different states; most of the jobs were only for a week or less; except for one job, he was never 'more than a gangplank from shore'; his job did not involve going to sea; he did not travel by vessel from job to job; he had no vessel related duties on any job; he often worked from land for certain jobs; other than one job, he did not live aboard any vessel; and he was paid a *per diem* and lived ashore in hotels."[51]  Citing these facts, Specialty argues that Stringer does meet the "substantial connection" prong of the seaman-status test under the three factors added by the Fifth Circuit in *Sanchez*.[52]  Specialty says that Stringer was a land-based employee whose duties did not take him to sea because Stringer worked on nine different projects while employed at Specialty and, during all except one, Stringer slept and mostly ate on land, drove to the worksites that were adjacent to land, and was paid a *per diem* for meals and lodging.[53]  Specialty cites to several cases with similar facts – including *In re Ingram Barge Co.*, 2023 WL 6123107 (5th Cir. Sep. 19, 2023); *Rutherford v. Pontchartrain Materials Corp.*, 732 F. Supp. 3d 536 (E.D. La. 2024); *Meaux v. Cooper Consolidated, LLC*, 601 F. Supp. 3d 38 (E.D. La. 2022); *Bouton v. Manson Construction Co.*, 705 F. Supp. 3d 622 (W.D. La. 2023); and *Burton v. Weeks Marine, Inc.*, 2023 WL 8607016 (W.D. La. Dec. 12, 2023) – where the court found that it did not need to consider the duration prong (or it did not matter that plaintiff satisfied the duration prong), because the plaintiff could not meet one or more of the three *Sanchez* factors.[54]  More particularly as to the three *Sanchez* factors, Specialty contends that Stringer owed his allegiance to it as his employer, and not to a particular vessel (or fleet of Specialty vessels), because he worked on nine different projects while employed at Specialty and only one – the Alcoa project – involved the barge Specialty rented, whereas the other projects involved client-owned vessels or no vessel

---

[51] R. Doc. 41-1 at 3; *see also* R. Doc. 42 at 9, 11-12.
[52] R. Docs. 41-1 at 1-21; 42 at 11-12.
[53] R. Doc. 41-1 at 13-14.
[54] *Id.* at 15-20.

at all.[55]  Next, Specialty contends that Stringer's work did not involve seagoing activity because the barge on which he worked (like others on which he worked) was spudded down next to the shore and accessed by the workers via a ladder from land.[56]  Finally, Specialty asserts that Stringer's assignment to a vessel, if there was a vessel assignment at all, would have ended with the project and there is no evidence that Specialty would have rented the Compass Marine barge for the next project.[57]

In opposition to Specialty's motion and in a reply in further support of his own motion, Stringer argues that Specialty's Rule 30(b)(6) deposition and that of McGrady support that he is a Jones Act seaman.[58]  Stringer reasserts that the deposition testimony shows that he was assigned to vessels for 97.6% of the time he was employed by Specialty.[59]  Stringer also argues that the dive support vessel was still a vessel when it was "spudded down" (contrary to what he says Specialty asserts), and that he served the mission of an identifiable fleet of vessels owned or controlled by Specialty.[60]  Stringer also reurges that he assisted in the navigation of the dive support vessel he rode to the Alcoa job.[61]  He also contends that the case law cited by Specialty is distinguishable because it "focuses on spud barges or stationary vessels anchored out of navigation l[a]nes, connected to shore with gangplanks, and plaintiffs that did not sail with the vessels."[62]

Specialty replies to Stringer's opposition to its motion, reasserting that its "primary argument is that [Stringer] does not qualify as a seaman because he does not satisfy the 'substantial in nature' element of the second *Chandris* prong because he could not satisfy the three *Sanchez*

---

[55] *Id.* at 19.
[56] *Id.*
[57] *Id.* at 20.
[58] R. Docs. 43 at 1; 48 at 4.
[59] R. Docs. 43 at 2-4; 48 at 4.
[60] R. Docs. 43 at 4-12; 48 at 4.
[61] R. Docs. 43 at 8-10; 48 at 4.
[62] R. Doc. 43 at 10.

factors."[63]  Specialty again refers to the same evidence it previously cited to demonstrate that Stringer cannot meet the *Sanchez* test for seaman status.[64]  Specialty reurges that courts have denied seaman status when the circumstances of the plaintiffs' employment did not satisfy S*anchez*, even if they satisfied the duration prong of *Chandris*.[65]  Specialty also disclaims making any arguments regarding the vessel status of the Compass Marine work barge, which arguments it says are red herrings in any event.[66]

## III.    LAW & ANALYSIS

### A.  Rule 54(b) Standard

The rule under which Stringer seeks reconsideration – Rule 59 – is inapplicable.  This Court's August 27, 2025 Order & Reasons was an interlocutory order that did not result in a final judgment or disposition of the case.  Motions for reconsideration of interlocutory orders are governed by Rule 54(b) of the Federal Rules of Civil Procedure.  Under that rule, a "court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quotation omitted).  Rule 54(b) "'reflect[s] the inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'"  *Id.* at 337 (quoting *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015)) (internal quotation marks omitted).  However, the district court must exercise this broad discretion sparingly to forestall the perpetual reexamination of orders and the resulting burdens and delays.  *See Calpecto 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993) (observing that if "the district court was required to reconsider [an interlocutory order] simply because [the losing party]

---

[63] R. Doc. 45 at 1.
[64] *Id.* at 1-2.
[65] *Id.* at 2, 4-5.
[66] *Id.* at 2, 5.

belatedly came forward with evidence not submitted prior to the ruling[,] ... the cycle of reconsideration would be never-ending"); *Domain Prot., LLC v. Sea Wasp, LLC*, 2019 WL 3933614, at *5 (E.D. Tex. Aug. 20, 2019) ("[A]lthough a district court may revisit an interlocutory order on any ground it sees fit, it may also use its discretion to prevent parties from, without justification, raising new arguments for the first time." (emphasis, alteration, and quotation omitted)); 18B WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 4478.1 (3d ed. 2019) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment.").

Stringer is not really seeking reconsideration of this Court's prior ruling. Instead, he is renewing and supplementing with new evidence his motion for summary judgment now that discovery has been completed. Thus, the Court will consider both Stringer's motion to reconsider and Specialty's motion for summary judgment under the Rule 56 standard.

### B. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets

that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such

facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B).  Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### C. Analysis – Seaman Status

Depending on the status of an injured worker and the allegedly responsible party, a maritime worker injured in the course and scope of his employment may bring an action under the Jones Act, the Longshore and Harbor Workers' Compensation Act ("LHWCA"), the general maritime law, or state law.  *See Chandris*, 515 U.S. at 355-56.  The Jones Act permits a "seaman injured in the course of employment ... to bring a civil action at law, with the right of trial by jury, against the employer."  46 U.S.C. § 30104.  A Jones Act seaman may also bring a claim against his employer for maintenance and cure and unseaworthiness.  *See Becker v. Tidewater, Inc.,* 335 F.3d 376, 387 (5th Cir. 2003); *Meche v. Doucet*, 777 F.3d 237, 244 (5th Cir. 2015).  The LHWCA is a workers' compensation system and the exclusive remedy available to "a broad range of land-based maritime workers" who are injured in the course and scope of their employment but are not seaman and thus not entitled to sue under the Jones Act.  *Chandris*, 515 U.S. at 355 (citing 33 U.S.C. § 902(3)(G)).

The term "seaman" is not defined in the Jones Act.  *See* 46 U.S.C. § 30104*.*  A plaintiff must establish seaman status.  *Becker*, 335 F.3d at 390 n.8.  Determining "whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact." *Id.* at 386.  Although

the Jones Act does not define the term "seaman," Congress has elsewhere defined it as the "master or member of any crew of any vessel." 33 U.S.C. § 902(3)(G); *see also Chandris,* 515 U.S. at 355-56. However, not every "maritime worker on a ship at sea … is automatically a member of the crew of the vessel within the meaning of the statutory terms." *Chandris*, 515 U.S. at 363. Job title does not determine seaman status. *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 558 (1997). But seamen "owe their allegiance to a vessel and not solely to a land-based employer." *Chandris*, 515 U.S. at 359 (quotation omitted). The "inquiry is fundamentally status based: Land-based maritime workers do not become seamen because they happen to be working aboard a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361. Moreover, "[i]n evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence." *Id.* at 363 (quotation and citation omitted). "Thus, a worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured." *Id.*

In *Chandris*, the Supreme Court established a two-part test for seaman status. First, the employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission." *Id.* at 368. Satisfying this part of the seaman test is relatively easy because the individual "need only show that he does the ship's work." *Becker*, 335 F.3d at 387-88. "This threshold requirement is 'very broad,' encompassing 'all who work at sea in the service of a ship.'" *Id.* (quoting *Chandris*, 515 U.S. at 368).

Second, the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its *duration* and its *nature*."

13

*Chandris*, 515 U.S. at 368 (emphasis added). The claimed connection to a vessel or fleet of vessels must be temporally, more than fleeting, and substantively, more than incidental, because the fundamental purpose of the substantial connection requirement is "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.*

"The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time." *Id.* at 370.  In determining the durational aspect of the vessel-connection requirement, the Supreme Court has adopted the Fifth Circuit's general rule of thumb that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.* at 371.  The Supreme Court explained that this figure –

> serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.  As we have said, the inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it.

*Id.* (quotation and citation omitted).

In determining whether an employee has a substantial connection to a vessel in navigation in terms of its nature, again, "it is not the employee's particular job that is determinative [of seaman status], but the employee's connection to a vessel." *Id.* at 364 (quotation omitted).  Until *Sanchez*, an employee would qualify for seaman status if the employee's connection to a vessel "regularly exposes him to the perils of the sea." *In re Endeavor Marine, Inc.*, 234 F.3d 287, 291 (5th Cir. 2000) (explaining *Papai*, 520 U.S. at 554-55), *abrogated by Sanchez*, 997 F.3d at 573.  Further,

an employee would still be deemed exposed to the perils of the sea despite limited experience in the open water; therefore, workers involved in a vessel's work near shore "still remain exposed to the perils of a maritime work environment." *Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 934 (5th Cir. 2014) (rejecting "the categorical assertion that workers who spend their time aboard vessels near the shore do not face maritime perils"), *overruled on other grounds by Sanchez*, 997 F.3d at 573.

In *Sanchez*, the Fifth Circuit, sitting en banc, expressly overruled the panel decision in *Naquin* and called into question the panel decision in *Endeavor Marine* to the extent they held that the nature prong of the *Chandris* test was satisfied simply by the plaintiff's exposure to the "perils of the sea," without requiring more. *Sanchez*, 997 F.3d at 573. In the wake of *Sanchez*, courts examining the nature of a putative Jones Act seaman's connection to a vessel must make the following "additional inquiries" – that is to say, in addition to asking whether a worker was subject to the perils of the sea, courts must ask:

> (1) Does the worker owe his allegiance to the vessel rather than simply to a shoreside employer?
>
> (2) Is the work sea-based or [does it] involve seagoing activity?
>
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Id.* at 574.

This case is factually similar to two others in which this Court ultimately held that the plaintiffs were not Jones Act seaman – namely, *Meaux* and *Rutherford*. *See Meaux*, 601 F. Supp. 3d at 43-54; *Rutherford*, 732 F. Supp. 3d at 546. In *Meaux*, the plaintiff was employed by Savard Marine Services, Inc. d/b/a Savard Labor & Maritime Personnel, Inc. ("Savard") to work for

Cooper Consolidated, LLC ("Cooper") as a borrowed employee pursuant to a staffing agreement. *Meaux*, 601 F. Supp. 3d at 41-42. Cooper's operations consisted of loading and unloading large, oceangoing cargo vessels midstream in the Mississippi River at three separate work locations. To perform this work, Cooper owned and operated a fleet of floating derrick crane barges that were brought by tugboat alongside the cargo vessels, which were moored to buoys midstream in the Mississippi River. *Id.* at 43-44. Cooper assigned certain workers, who were either full-time Cooper employees or employees hired through a union hall, to work aboard each crane barge as a crew consisting of a crane operator, oiler, and deckhand. *Id.* at 44. Cooper also assigned other workers, who were hired through staffing companies like Savard, to so-called "longshore crews," which consisted of a "flag person" (or flagger), "utility person," and "equipment operator" to assist with Cooper's cargo operations. *Id.* Their work was typically done aboard the larger, oceangoing cargo vessels that were being loaded and unloaded. *Id.* The plaintiff was a flagger and utility man who was usually positioned aboard the oceangoing vessels that were being unloaded or the barges containing cargo that was being loaded onto the oceangoing vessels. *Id.* at 45. Cooper controlled the plaintiff's work, he drove to and from work every day, and he did not sleep on any vessel. *Id.* The plaintiff rode crew boats to the worksites, but never performed any work aboard the transport vessels while he was a passenger. *Id.* at 47.

In *Meaux,* this Court considered the issue of the plaintiff's seaman status four times. On the fourth occasion, with the benefit of a bench trial and a more fully developed factual record, the Court held that the plaintiff was not a seaman because the evidence showed that he did not engage in sea-based or seagoing activity and did not sail with Cooper's vessels. *Id.* at 51-54. The Court did not specifically take into account the duration of the plaintiff's time working on vessels. *Id.*

While acknowledging that the plaintiff worked midstream in the Mississippi River and took a crew boat to get to his worksite, this Court concluded that:

> Boarding a crew boat to get to work is not seagoing activity; nor is performing longshore work near or around water. Otherwise, scores of maritime workers would be transformed into Jones Act seamen who the law currently does not recognize as such. As this Court previously observed, Meaux would certainly not be categorized as a seaman if the vessel being loaded and on which he worked was dockside. Simply put, it cannot be said that Meaux's duties took him to sea in the way *Sanchez* envisions to allow his work to be considered sea-based or its nature seagoing activity.

*Id.* at 54 (citing *Meaux v. Cooper Consol., LLC*, 545 F. Supp. 3d 383, 390 (E.D. La. 2021)). As to the third *Sanchez* inquiry – namely, whether the plaintiff's assignment included sailing with the crane barges from port to port or location to location – this Court noted that there was no evidence that the plaintiff sailed with Cooper's crane barges from cargo-handling location to cargo-handling location, nor that he did any work on the crane barges or the crew boats while they were in transit. *Id.* And, finally, "at the end of the [work] day, [the plaintiff] would take the crew boat to shore and he would go home like any other longshoreman." *Id.*

This Court reached the same result in *Rutherford*. *Rutherford*, 732 F. Supp. 3d at 546. The plaintiff in that case was employed by Pontchartrain Materials Corporation, LLC ("Pontchartrain"), which operated four aggregate construction material yards in southeast Louisiana where its marine department unloaded the material from third-party-owned hopper barges to shore. *Id.* at 539. Pontchartrain owned and operated three spud barges that it used in conjunction with the material handling work. *Id.* For an unloading operation, Pontchartrain's barge was spudded down or tied to shore and connected to land by a gangplank for the duration of the operation. *Id.* Then, a third-party-owned hopper barge full of aggregate material was placed alongside Pontchartrain's spud barge and Pontchartrain employees used an excavator or front-end loader to unload the aggregate material from the material barge and place it in a dump truck or a

pile on land. *Id.* During the unloading operations, Rutherford worked on the third-party-owned-and-operated material barges signaling the crane operator, or using a front-end loader, to move the aggregate. *Id.* When an unloading operation was complete, the Pontchartrain spud barge was moved by a third-party-owned tugboat to its next work location. *Id.*

Pontchartrain employees did not usually ride a spud barge to its next location, but have done so on rare occasions, for a short time or to cover a short distance. *Id.* Pontchartrain employed Rutherford as a loader operator and oiler on its spud barges. *Id.* He was primarily assigned to work on one of Pontchartrain's barges at various of Pontchartrain's aggregate yards. *Id.* Pontchartrain's shoreside operations manager assigned Rutherford's work locations and told him where to report each day. *Id.* Rutherford drove to the assigned aggregate yard for each shift and returned home every night. *Id.* He boarded the Pontchartrain spud barges by ladder or tow boat, but did not sleep on or sail with any vessel. *Id.* Rutherford performed some maintenance on the spud barges, such as fueling and greasing the excavators, cranes, and front-end loaders. *Id.* He was also responsible for spudding down and cleaning Pontchartrain's spud barges and tying up the third-party-owned material barges to them. *Id.* at 539-40. Additionally, Rutherford unloaded material barges or assisted his supervisor and the barge's captain in unloading operations. *Id.* at 540. Rutherford estimated that he spent 80-to-90 percent of his time with Pontchartrain working on water. *Id.*

With these facts, this Court held that, even if Rutherford satisfied all the other prongs of the seaman-status test, he was not a Jones Act seaman because he did not engage in sea-based or seagoing activity and did not sail with Pontchartrain's vessels. *Id.* at 546. The Court acknowledged that *Rutherford* did not present as close of a call as did *Meaux*. *Id.* But the undisputed evidence showed that Rutherford nearly always worked on vessels that were only a

18

gangplank away from shore.  *Id.*  His work was performed on the third-party-owned material barges that were tied off to the spud barges that were in turn almost always located near shore, and he never worked on any vessel while it was in motion.  *Id.*  This Court just could not find that Rutherford was a seaman when his work had him even closer to shore than the plaintiff in *Meaux*. *Id.*

The facts of Stringer's employment with Specialty yield the same result as in *Meaux* and *Rutherfurd*.  Simply put, even if he were to meet the other factors of seaman status, Stringer is not a Jones Act seaman under the *Sanchez* factors.  At the outset, the Court acknowledges that Stringer's work as a diver arguably constituted seagoing activity when he was diving.  However, the other facts of his employment with Specialty prove that he was not a Jones Act seaman. Stringer owed his allegiance to the shoreside employer, not a vessel.  He was assigned to multiple different vessels when he worked for Specialty (including many that were not owned by Specialty) and there is no evidence that he had allegiance to any of them.  Although Stringer briefly rode aboard the Compass Marine barge as it was being pushed to the dive site and served as a lookout, this one-time, limited event does not mean that Stringer sailed with the vessel from port-to-port or had any allegiance to that vessel.   Rather, he performed this discrete task while riding the barge to the dive site and then utilized the barge as a dive support vessel.  There is no evidence that Stringer ever would have worked on the vessel again after the Alcoa job ended.  Moreover, other than the act of diving, Stringer's employment did not take him to sea.  On eight of the nine jobs Stringer did for Specialty, he was never more than a gangplank from shore.  He nearly always (other than the one job) lived on land, received a *per diem* for food and lodging, drove to the jobsite, and boarded the dive support vessel from a gangplank.  On the job where the injury occurred, Stringer lived on land, drove to the worksite daily, and boarded the dive support vessel

by ladder.  It is immaterial that he sometimes ate aboard the vessel for convenience.  He still slept, and ate most meals, on land.  Under these facts, as in *Meaux* and *Rutherford*, Stringer is not a Jones Act seaman.

**IV.    CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that Stringer's motion for reconsideration (R. Doc. 32) is DENIED.

IT IS FURTHER ORDERED that Specialty's motion for summary judgment on seaman status is GRANTED, and, as a result, Stringer's claims that depend upon that status (negligence under the Jones Act and general maritime law, along with general maritime law claims for unseaworthiness and maintenance and cure) are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 14th day of November, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE